UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**EDDIE HUMES, SR.**                                                                                          **PLAINTIFF**

v.                                           Case No. 4:20-CV-479-LPR

**WHITE COUNTY, ARKANSAS,**
A Public Body Corporate and Politic, et al.                                           **DEFENDANTS**

# ORDER

The Court has received a Partial Recommended Disposition (PRD) from United States Magistrate Judge J. Thomas Ray and timely Objections from Defendants Stephanie Gray and Misty Jones. After careful consideration of the Objections and a *de novo* review of the PRD and the record, the Court approves and adopts the PRD in its entirety as this Court's findings in all respects, except to the extent it is inconsistent with the following discrete points.

First, the Court chooses not to adopt the full paragraph on page 21 of the PRD.[1] That paragraph focuses on whether the Eighth Circuit would have jurisdiction to hear a qualified-immunity-based interlocutory appeal. My decision to forgo adoption of this portion of the PRD is not a comment on the correctness or incorrectness of Magistrate Judge Ray's analysis. Rather, in my view, whether the Eighth Circuit has jurisdiction to hear such an appeal—and the appropriate scope of that jurisdiction—is a question for the Eighth Circuit or the Supreme Court. It is not a question upon which a district court should opine.[2]

Second, the Court does not agree with Ms. Gray and Lt. Jones that Plaintiff Humes's

---

[1] Partial Recommended Disposition (Doc. 58) at 21.

[2] If Ms. Gray and Lt. Jones take an interlocutory appeal, and if the Eighth Circuit determines it has jurisdiction to hear that appeal, I encourage the Eighth Circuit to take a very hard look at this case. I think Ms. Gray and Lt. Jones have serious arguments on the second prong of the qualified-immunity analysis. While I am ultimately not persuaded by those arguments, I acknowledge it is a close call and I might well be wrong.

version of the facts "is blatantly contradicted by the record."[3]  This objection goes to the evidence concerning whether Ms. Gray and Lt. Jones actually saw Mr. Humes on certain days.  There is testimony from Mr. Humes and an affidavit from Mr. Humes's cellmate that Ms. Gray and Lt. Jones came to Mr. Humes's cell and saw his hand/arm on October 21st, 22nd, and 23rd.[4]  In a *Scott v. Harris*-inspired effort to fatally undermine this testimony—that is, to show that no rational juror could accept it—Defendants point to a log that purports to show which jailers visited which cells on which days.[5]  But, unlike the video in *Scott*, the existence of the log does not *definitively* resolve the fact dispute of whether Ms. Gray and Lt. Jones visited Mr. Humes's cell.  Given the lack of any record evidence regarding how the log is created, how comprehensive the log is designed to be, or how the log is maintained, a rational juror could still believe Mr. Humes and his cellmate.  That is, a rational juror could conclude that Ms. Gray and Lt. Jones visited Mr. Humes's cell without a log entry being made.[6]

---

[3] Objections to Report and Recommendations (Doc. 59) at 1 (emphasis omitted).

[4] *See* Ex. 8 (Dep. of Eddie Humes) to Defs.' Mot. for Summ. J. (Doc. 43-8) at 40:25–41:3, 43:24–44:3; Ex. A (Aff. of Austin Coughlin) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1) ¶¶ 6–7.  The Court agrees with Ms. Gray and Lt. Jones that there is no evidence whatsoever to suggest that they saw or knew about Mr. Humes's hand/arm before midday October 21st.  Specifically, there is no evidence that either Ms. Gray or Lt. Jones was the lady at the desk or the "booking lady" with whom Mr. Humes interacted during the very early morning hours (2:00 a.m.–4:00 a.m.) on October 21st.  *See* Ex. 8 (Dep. of Eddie Humes) to Defs.' Mot. for Summ. J. (Doc. 43-8) at 20:14–16, 21:12, 22:18–20.  The Court also agrees with Ms. Gray and Lt. Jones that the October 24th written sick-call request was seen and responded to by Nurse Hall only (as opposed to being seen or responded to by Ms. Gray).  Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50) ¶¶ 20–21; Ex. 6 (Decl. of Stephanie Gray) to Defs.' Mot. for Summ. J. (Doc. 43-6) ¶¶ 3–4.  And with respect to the written grievance on the morning of October 25th, Lt. Jones's alleged written response to and inaction concerning that grievance is beside the point because Mr. Humes was transported to the hospital within about an hour of writing that grievance.  *See* Ex. B (Humes Grievance) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1); Ex. D (Hospital Record) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1).  To the extent the PRD suggests potential deliberate-indifference liability for Ms. Gray and Lt. Jones based on what either of them did or didn't do (1) prior to October 21st, (2) in response to the October 24th written sick call request, or (3) in response to the October 25th written grievance, the Court declines to adopt that part of the analysis.

[5] *See* Objections to Report and Recommendations (Doc. 59) at 1; Ex. E (Offender Log Report) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1); Ex. A (Offender Log Report) to Defs.' Reply to Resp. to Mot. for Summ. J. (Doc. 52-1).

[6] *Scott* itself made clear that its rule was not applicable to a case like the one we have here.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.").

Third, the Court acknowledges that this question—whether there is a *genuine* dispute as to the aforementioned cell visits—is a closer call with respect to Lt. Jones. That is because Mr. Humes consistently referred to Lt. Jones using male pronouns.[7] Lt. Jones is a woman. Mr. Humes acknowledged in his Amended and Substituted Response to the Statement of Undisputed Facts that he "was under the mistaken belief that . . . Jones was a male" even though "it is clear that Jones is a female employee."[8] Defendants assert that this definitively shows Mr. Humes is mistakenly attributing to Lt. Jones visits made to Mr. Humes's cell by some unidentified male jailer.[9] While that is an incredibly strong argument, it falls just shy of winning the day at this stage of the litigation. Regardless of what the Court might conclude were it a juror, it would not be irrational for a juror to find that Mr. Humes accurately remembered the name of the jailer with whom he interacted but could not accurately remember her sex. This finding would have some support in the affidavit of Mr. Humes's cellmate, which also described Lt. Jones visiting Mr. Humes's cell.[10]

Fourth, the hardest issue in this case is—unsurprisingly—qualified immunity. Specifically, the Court wishes to address Defendants' argument that they are entitled to qualified immunity "even assuming" the most pro-Plaintiff version of the facts that a jury could rationally conclude occurred.[11] In the context of this case, the first prong of the qualified-immunity analysis

---

[7] *See* Ex. 8 (Dep. of Eddie Humes) to Defs.' Mot. for Summ. J. (Doc. 43-8) at 43:25–44:13, 45:9–13.

[8] Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50) ¶ 36.

[9] Defs.' Reply to Resp. to Mot. for Summ. J. (Doc. 52) at 6.

[10] Ex. A (Aff. of Austin Coughlin) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1) ¶ 7. In his affidavit, Mr. Humes's cellmate used both male and female pronouns to refer to Lt. Jones. *Id.* In context, a rational juror could think the male pronoun usage in the affidavit was simply a typographical error or scrivener's error.

[11] Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 44) at 6–12.

is simply whether each defendant at issue violated the Constitution.[12] The second prong is whether it was clearly established at the time the particular defendant acted or refrained from acting that the defendant's action or inaction violated the Constitution.[13]

Everyone agrees that, by October of 2017, it was clearly established that a jailer violated the Constitution if he or she was deliberately indifferent to a prisoner's serious medical needs.[14] Everyone agrees that, by October of 2017, it was clearly established that the deliberate-indifference test had two parts: (1) the existence of an objectively serious medical need, and (2) the defendant's subjective knowledge of the serious medical need and deliberate disregard of it.[15] And everyone agrees that, by October of 2017, a serious medical need was defined as one that had been diagnosed by a physician as requiring treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.[16]

That's where the agreement ends. Defendants argue that (1) it was not clearly established by prior precedent that Mr. Humes's spider bite/infection constituted an objectively serious medical need, and (2) it was not clearly established that Defendants' inaction on October 21st, 22nd, and 23rd constituted deliberate disregard of that need.[17] With respect to these issues, the most pro-Plaintiff version of the record is as follows. Ms. Gray and Lt. Jones saw Mr. Humes and

---

[12] *See, e.g.*, *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005).

[13] *Id.*

[14] Pl.'s Am. and Substituted Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 51) at 18; Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 44) at 6; *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004).

[15] Pl.'s Am. and Substituted Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 51) at 14; Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 44) at 6; *Hartsfield*, 371 F.3d at 457.

[16] Pl.'s Am. and Substituted Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 51) at 18; Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 44) at 7; *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995). There are certainly legitimate criticisms of the underpinnings and scope of deliberate indifference as a constitutional doctrine. *See, e.g.*, *Helphenstine v. Lewis Cnty.*, No. 22-5407, 2023 WL 2985079 (6th Cir. 2023) (Readler, J., statement respecting denial of rehearing en banc). However, as a district court, my remit is to apply Supreme Court and Eighth Circuit precedent as it currently stands.

[17] Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 44) at 10–12.

his hand/arm on October 21st, 22nd, and 23rd.  They saw that his hand/arm continued to swell larger each day, and that—at some point in this time period—his hand/arm was the size of a small watermelon[18] and oozing pus.[19]  And they knew he was in significant pain.[20]  Nonetheless, despite telling him they would try to get him medical assistance, Ms. Gray and Lt. Jones took no action at all.[21]

A large and growing infection of the type that oozes pus and causes significant, worsening, and out-of-the-ordinary-sized swelling constitutes a medical need that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.  And this was clearly established by October of 2017.  Indeed, back in 2004, in *Hartsfield v. Colburn*, the Eighth Circuit concluded that "extreme pain from loose and infected teeth, which caused blood to seep from his gums, swelling, and difficulty sleeping and eating" constituted "a need for medical attention that

---

[18] *See* Ex. 8 (Dep. of Eddie Humes) to Defs.' Mot. for Summ. J. (Doc. 43-8) at 42:7–12, 73:9–10.  Mr. Humes's claim that his hand/arm swelled up to the size of a watermelon in the October 21–24 time period is difficult to reconcile with the October 25, 2017 medical forms from the White County Medical Center.  Ex. D (Hospital Record) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1). Those forms do note swelling and cellulitis, but don't suggest a watermelon-sized abnormality.  *Id.*  Moreover, the forms described the symptoms as "moderate" and the level of urgency as "4 less urgent." *Id.*  Nonetheless, the forms do not definitively rule out the watermelon description made by Mr. Humes.  At the very least, they do not rule out the notion that the swelling was very large during some portion of the October 21–24 timeframe.

[19] Ex. A (Aff. of Austin Coughlin) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1) ¶ 8.

[20] Mr. Humes testified that he told "them" that his hand was hurting him "really, really bad" and that he was in "bad pain." Ex. 8 (Dep. of Eddie Humes) to Defs.' Mot. for Summ. J. (Doc. 43-8) at 26:17–18, 27:16.  Granted, it is not entirely clear from his testimony that "them" referred to Ms. Gray and Lt. Jones.  But Mr. Humes's cellmate, Austin Coughlin, testified that Mr. Humes's hand was causing Mr. Humes "real bad pain," and that he saw Mr. Humes speaking with Ms. Gray and Lt. Jones about Mr. Humes's hand.  Ex. A (Aff. of Austin Coughlin) to Pl.'s Am. and Substituted Resp. to Defs.' Statement of Undisputed Facts (Doc. 50-1) ¶¶ 4, 6–7.  The combination of these statements strongly suggests that Ms. Gray and Lt. Jones knew about Mr. Humes's pain.  A rational juror could reasonably make such an inference.

[21] Ms. Gray and Lt. Jones seem to dispute that the most pro-Plaintiff read of the record includes the notion that these Defendants took no action at all.  But their declarations make this clear.  They each state that they had no in-person encounters with him and never saw his hand/arm.  Ex. 4 (Decl. of Misty Jones) to Defs.' Mot. for Summ. J. (Doc. 43-4) ¶ 7; Ex. 6 (Decl. of Stephanie Gray) to Defs.' Mot. for Summ. J. (Doc. 43-6) ¶ 6.  The obvious implication—and the reasonable inference a rational juror could draw—is that they never took any action concerning his hand/arm, since they claim to never have seen or heard about it on the 22nd, 23rd, or 24th.  So, if a juror ends up believing that Ms. Gray and/or Lt. Jones actually did see Mr. Humes's hand/arm on those dates, the most pro-Plaintiff read of the record is that they saw his hand/arm and did nothing about it at all.

would have been obvious to a layperson . . . ."²² The medical need in the case at bar was as obvious as the need in *Hartsfield* was. No closer analogue is necessary to satisfy the clearly established analysis.

With respect to *Hartsfield*, Ms. Gray and Lt. Jones cry foul. At the summary-judgment hearing held by the Court, they asserted that the Court should ignore *Hartsfield* because it was not mentioned by Mr. Humes in his briefing or at oral argument.²³ Essentially, their argument seems to be that a court may not conduct its own legal research on the "clearly established" question, but rather is limited to evaluating the caselaw presented by Mr. Humes. That would certainly be a surprise, as it would distinguish this portion of the qualified-immunity analysis from, well, every other area of law in existence. And, of course, the Eighth Circuit case Defendants cite for this proposition—*Estate of Walker v. Wallace*—says nothing of the sort. *Wallace* merely says "[t]he plaintiffs have the burden of showing that the law was clearly established."²⁴ The allocation of the burden here doesn't preclude courts from conducting independent legal research any more than the allocation of burdens in other contexts would.

In any event, because the Court did not ask about the *Hartsfield* case until oral argument, the Court gave Defendants seven days to file a supplemental submission discussing how that case affected the "clearly established" analysis. And it gave Plaintiff five days to respond to that supplemental submission. Both sides filed appropriate submissions.²⁵ After reviewing them, the Court still believes that, for purposes of the objectively-serious-medical-need question, *Hartsfield*'s facts are close enough to have clearly established that the medical need in our case

---

²² 371 F.3d at 457.

²³ Apr. 17, 2023 Hr'g Tr. (Rough) at 20.

²⁴ *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018).

²⁵ Suppl. Br. in Supp. of Mot. for Summ. J. (Doc. 63); Suppl. Br. in Supp. of Opp'n to Mot. for Summ. J. (Doc. 64).

6

was objectively serious.  Most of the distinctions Defendants identified between our case and *Hartsfield* go towards the subjective-knowledge/deliberate-disregard prong, not the objectively-serious-medical-need prong.  But the Court relies on *Hartsfield* primarily for the objectively-serious-medical-need prong.  And for that prong, Defendants' factual distinctions between the two cases basically amount to "teeth vs. arm" and "bleeding vs. oozing pus."  Those distinctions don't take *Hartsfield* out of the close analogue category.

At oral argument, Ms. Gray and Lt. Jones focused most of their qualified-immunity firepower on the subjective-knowledge/deliberate-disregard prong.[26]  Essentially, their argument goes something like this.  (1) On October 21, 2017, Nurse Hall saw Mr. Humes's hand/arm while making rounds in the jail.  She obviously didn't think it was an emergency then because she simply told Mr. Humes she would check it the next day.  (2) Then, on October 24, 2017, Nurse Hall received Mr. Humes's written sick-call request concerning his hand/arm and responded that he would be put on the sick-call list for the next day (which turned out to be the day he was brought to the hospital).  (3) There is no clearly established deliberate-indifference caselaw that requires jailers like Ms. Gray and Lt. Jones to second guess the medical decisions made by Nurse Hall, including whether and when Mr. Humes required treatment.

That's not a bad argument.  But there is, at least in my opinion, a fatal flaw in it.  There is (currently) no record evidence whatsoever—and certainly no definitive evidence for summary-judgment purposes—that Ms. Gray or Lt. Jones even knew that Nurse Hall had seen Mr. Humes's hand/arm.  Moreover, reading the record in the light most favorable to Mr. Humes, Ms. Gray and Lt. Jones did not rely in any way on whatever Nurse Hall's medical judgment might have been.  To be clear, this is not a case where the defendant jailers admit to seeing a potential medical issue,

---

[26] Apr. 17, 2023 Hr'g Tr. (Rough) at 24–27, 33–38.

but claim they were told by medical staff that the issue did not need immediate attention or otherwise knew medical staff had made such a determination. Instead, here, Ms. Gray and Lt. Jones contend they never took any action because they never saw Mr. Humes's hand/arm.

If the jury concludes one or both Defendants are lying about not seeing Mr. Humes on October 21st, 22nd, and 23rd, then we are left in a situation (at least given the current state of the record) in which one or both Defendants saw Mr. Humes's watermelon-sized, oozing hand/arm, didn't know medical had seen it, falsely told him they'd try to get medical attention, and then proceeded to ignore the situation entirely. On that understanding of the record, all of the reliance-on-medical-staff-judgment cases provided by Defendants would be inapplicable.[27] And their inapplicability makes a great deal of sense given the purpose of the "clearly established case law" test. The test is designed to ensure that government officials are not held liable for conduct that they mistakenly believed conformed to the law. It protects "all but the plainly incompetent or those who knowingly violate the law."[28] So the determination of whether (under clearly established law) Ms. Gray and Lt. Jones subjectively knew of and deliberately disregarded a serious medical need should not turn on facts that Ms. Gray and Lt. Jones did not know at the time they chose to ignore Mr. Humes's medical situation. The fortuity that a medical staff member had previously visited Mr. Humes's cell might be relevant in other portions of the case analysis, but it is not relevant here because Ms. Gray and Lt. Jones had no knowledge of it.[29]

---

[27] *See Derx v. Culclager*, No. 4:20-CV-00831-BRW-JTK, 2021 WL 3746564, at *4 (E.D. Ark. Aug. 3, 2021) (warden's "decision *to follow the nurse's advice* was not deliberately indifferent") (emphasis added); *see also Crooks v. Nix*, 872 F.2d 800, 803 (8th Cir. 1989) ("Obviously if the alleged denial of medical care was *based on* an alleged wrongful diagnostic judgment of a physician, the warden or prison director, lacking professional medical expertise, would not be liable *on agency principles* for any constitutional wrong.") (emphasis added); *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (same).

[28] *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

[29] To be clear, the Court also agrees with the PRD—although the PRD could have said it more clearly—that Ms. Gray and Lt. Jones can't rely on Nurse Hall's October 21st visit to Mr. Humes's cell because there is record evidence that Mr. Humes's hand/arm got worse on the 22nd and 23rd, when Ms. Gray and Lt. Jones saw him but medical staff did

8

As the PRD explains, by October of 2017, it was clearly established that a jailer who saw an infection like the one at issue here had subjective knowledge of a serious medical need.[30] And a jailer deliberately disregarded that medical need if he or she did nothing at all about the medical situation.[31] Certainly, a jailer deliberately disregarded the serious medical need if he or she told the inmate that he or she would try to get the inmate help and then did nothing at all.

Defendants' final qualified-immunity argument does give the Court considerable pause.[32] They argue that it was not clearly established that a few days' delay in treatment of an infected, watermelon-sized, oozing, and very painful hand/arm could constitute deliberate disregard of a serious medical need. At bottom, this comes down to a level-of-generality issue. Defendants think the Court is transgressing the oft-repeated warnings from the Eighth Circuit and Supreme Court to avoid analyzing the "clearly established" question at too general a level.[33] While the Court is cognizant of, and supportive of, these caselaw warnings,[34] the Court also understands that an exact factual match in prior precedent is not necessary. It is enough that, based on clear guideposts in prior precedent, only the utterly incompetent or intentional bad actor would have missed or ignored the pressing need for medical attention presented by an infected, watermelon-sized, and very painful oozing hand/arm. That's because everyone else would have conformed their conduct to what the Constitution clearly required.

---

not. *See* Partial Recommended Disposition (Doc. 58) at 19. *McRaven v. Sanders* may not be on all fours with our case, but it is close enough for its principle to apply for qualified-immunity purposes. 577 F.3d 974 (8th Cir. 2009).

[30] Partial Recommended Disposition (Doc. 58) at 19.

[31] *Id.* at 19–20.

[32] Suppl. Br. in Supp. of Mot. for Summ. J. (Doc. 63) at 5–8.

[33] *See, e.g.*, *Mullenix*, 577 U.S. at 12; *Furlow v. Belmar*, 52 F.4th 393, 404 (8th Cir. 2022).

[34] As the Court has identified in the past, there is serious debate as to the legal propriety of the qualified-immunity doctrine as a whole. *See Humphrey v. Payton*, No. 4:21-CV-00194-LPR, 2022 WL 17821616, at *2 n.5 (E.D. Ark. Dec. 20, 2022). However, unless and until the Supreme Court changes course, this Court must and will follow the parameters of the current doctrine.

"A delay in treating a serious medical need can constitute deliberate indifference."[35] A delay "in providing examinations" or otherwise getting medical attention for an inmate can constitute deliberate indifference "when the inmate['s] ailments are medically serious or painful in nature."[36] It is true that most of the Eighth Circuit cases setting forth these principles address delays of several weeks.[37] But the injuries at issue in those cases were less serious and emergent. Just as clear from the cases is that the length of delay that creates a constitutional violation is linked to the seriousness and immediacy of the medical problem. And there are plenty of situations in prior caselaw where short delays constituted deliberate disregard.[38] In the context of our case, and analogizing from this prior caselaw, all but the utterly incompetent or intentional bad actor would have recognized and acted on the need for immediate medical attention (or at least the need for medical attention within hours or a day). The two-to-three-day delay violated clearly established law, even if there were no cases concerning a watermelon-sized, oozing, and very painful hand/arm infection on the books at that point in time.

Moreover, it is worth noting that this is not a case where Ms. Gray and Lt. Jones merely delayed getting Mr. Humes treatment, and then eventually got him treatment. The Defendants did

---

[35] *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019).

[36] *Dadd v. Anoka Cnty.*, 827 F.3d 749, 755 (8th Cir. 2016) (citation omitted).

[37] *See Johnson*, 929 F.3d at 576–77 (collecting cases).

[38] *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104–05 & n.11 (1976) (citing *Hughes v. Noble*, 295 F.2d 495 (5th Cir. 1961) (delay of thirteen hours in getting inmate treatment for dislocated and fractured vertebrae sufficient to survive motion to dismiss)); *Dadd*, 827 F.3d at 756 (8th Cir. 2016) (noting that a delay does not have to be for "days, weeks, or months" to state a viable constitutional claim, and that a two-day delay in providing an inmate with pain medication was sufficient to survive a motion to dismiss); *Brown v. Hughes*, 894 F.2d 1533, 1536, 1538 (11th Cir. 1990) (delay of six hours in getting treatment for inmate's broken foot was sufficient to survive summary judgment); *Edwards v. Snyder*, 478 F.3d 827, 830–32 (7th Cir. 2007) (denial of treatment for inmate's severely dislocated finger for two days was sufficient to survive motion to dismiss); *Grieveson v. Anderson*, 538 F.3d 763, 779–80 (7th Cir. 2008) (delay of one-and-a-half days in getting inmate treatment for broken nose sufficient to survive summary judgment); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 578, 585 (3d Cir. 2003) (21-hour delay in providing insulin to diabetic inmate sufficient to survive summary judgment).

nothing, at any time, to get him treatment. And they never intended to.[39] Indeed, on the most pro-Plaintiff read of the record, the Defendants did worse than nothing. They told Mr. Humes they were going to get him medical attention and then they did nothing. The mere fortuity that Mr. Humes eventually got treatment through another avenue is not relevant to Ms. Gray's conduct or Lt. Jones's conduct. Of course, it might be relevant to causation, but that's not a qualified-immunity issue.

Fifth, the Court acknowledges that there may be a strong causation argument to be made by Ms. Gray and Lt. Jones—an argument that repackages some of the arguments they have already made. That is, even though Nurse Hall's October 21st visit with Mr. Humes and Nurse Hall's October 24th response to Mr. Humes's written sick call request don't result in Defendants getting qualified immunity here, Nurse Hall's conduct is not entirely irrelevant to the ultimate question of liability. That is because, to state a constitutional violation against Ms. Gray and Lt. Jones, Mr. Humes must show that their deliberate indifference to his serious medical need caused him some injury.[40] For a number of reasons, that seems difficult in this case.

Even taking the record in the light most favorable to Mr. Humes, the most Ms. Gray and Lt. Jones can be liable for is a failure to bring Mr. Humes to the medical staff on October 21st, 22nd and 23rd. But given Nurse Hall's conduct on the 21st and the 24th, it is less than clear that she would have treated Mr. Humes or taken him to the hospital any earlier than the 25th anyway. Moreover, Mr. Humes's first trip to the hospital ended up not solving the problem, mostly because he ended up not getting the medications he was prescribed.[41] Wouldn't this have happened if he

---

[39] *See supra* note 21.

[40] *Senty-Haugen v. Goodno*, 462 F.3d 876, 890 (8th Cir. 2006).

[41] Ex. 8 (Dep. of Eddie Humes) to Defs.' Mot. for Summ. J. (Doc. 43-8) at 29:21–24.

had gone to the hospital on the 22nd or the 23rd instead of the 25th?

Still, there is just enough in the record for Mr. Humes to survive summary judgment on causation, especially considering the parties' briefing only lightly discusses it. Reading the disputed facts in the best light for Mr. Humes and making all reasonable inferences in favor of Mr. Humes, a rational juror could conclude that Mr. Humes's hand/arm got significantly worse each day, which would mean (1) perhaps the medical team would have sent him to the hospital on the 22nd even though Nurse Hall hadn't on the 21st, (2) perhaps the hospital would have been better able to treat him on the 22nd than it was on the 25th, and (3) perhaps he would have avoided surgery and additional pain.

Accordingly, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part. Summary judgment is GRANTED to Defendant Clayton Edwards on Mr. Humes's individual capacity claim against Mr. Edwards. Summary judgment is GRANTED to all Defendants on Mr. Humes's official capacity claims against them. Summary judgment is GRANTED to White County as to all claims against it. Mr. Humes's state-law claim for "medical negligence" is DISMISSED without prejudice.

On the other hand, summary judgment is DENIED to Ms. Gray and Lt. Jones on Mr. Humes's individual capacity deliberate-indifference claims against them. These claims PROCEED to a jury trial. Of course, at the close of that trial, and after the jury answers any interrogatories necessary to resolve genuinely disputed facts material to the qualified-immunity question, the Court will render a final qualified-immunity decision.[42] Only if the Court then concludes that Ms. Gray and Lt. Jones are not entitled to qualified immunity will the merits of the case go to the jury. All parties should understand that the present summary-judgment decision in

---

[42] *See Littrell v. Franklin*, 388 F.3d 578, 584–86 (8th Cir. 2004).

no way suggests how the ultimate qualified-immunity question might shake out, nor how the merits (if we get there) may resolve.

    IT IS SO ORDERED this 11th day of May 2023.

                                                _____
                                                LEE P. RUDOFSKY
                                                UNITED STATES DISTRICT JUDGE